Case number 21-5118, Air Transport Association of America, Inc., Doing Business as Airlines for America, an International Air Transport Association, a balance versus United States Department of Agriculture et al. Mr. Mitlitsky for the balance, Mr. Overvolt for the appellate. Thank you, your honor. Is it okay? Good morning. It's okay to begin? Yes, please. Thank you, your honor. Anton Mitlitsky for appellants. I'd like to reserve five minutes if I could. Sure. May it please the court. I want to make clear at the outset that my clients and their members do not object to and in fact fully support APHIS's AQI program. But I think it's common ground at this point that in the several decades since Congress established the program, it's been plagued by a lack of transparency and an inability of the agency to comply with the FACT Act. That's why APHIS hired Grant Thornton and promulgated the final rule. It was supposed to fix the agency's transparency problems and make sure that their user fee model complied with the statute. But the final rule simply did not accomplish that goal. The rule is arbitrary, capricious, and contrary to law for several reasons, and I'd like to focus on two here if I could. First, the rules in position of an additional fee on top of inspection and administrative costs to finance a reserve is contrary to the FACT Act, and in particular to Section 136AA1, in which Congress expressly granted the Secretary the authority to collect fees on top of costs to build and maintain such a reserve, but made clear that the authority expired in 2002. Mr. Matlitsky, go ahead and mention your other one and then we'll circle back. I'm sorry. The second one that I wanted to raise here is the duplicative fee issue, the issue of charging passenger fees and commercial aircraft fees for aircraft who carry passengers. But I'm happy to just start with the first one and answer your question, Your Honor. Sure. Why don't you go with the first one? So on the first one, do you understand the purpose of some short number of years after the fee system was established, this account in Treasury is set up, but it's set up only for the six-year period. Do you understand the purpose of having moved that over to Treasury and then transitioning back to having the money go and just be in agriculture's control? So I think the idea was that they were transitioning from an appropriations model to a direct user fee model. And so as I understand it, it's a little bit confusing under the statute, but as I understand the way it worked until 2002, the agency was collecting user fees in these three categories that were authorized. The first was fees sufficient to cover inspection costs. The second was fees sufficient to cover administrative costs. And the third was fees sufficient to maintain a reserve. And all of that money was going into this fund at Treasury. And then I believe that the money was then going from Treasury to agriculture through appropriations. And then after 2002, that entire fund- Wait, excuse me. So you're saying that Congress re-appropriated the money that was- not re-appropriated, appropriated the money in the Treasury account and designated it for agriculture? Is that what happened? I believe that's- Well, it didn't appropriate the money. It authorized the agency to collect money, collect fees in these three different respects. Those fees would go into a Treasury fund. And then that money through 2002 was transferred to agriculture from Treasury for agriculture to use on inspections. After 2002, the agency maintained two of the three fee prescription and collection authorities. The authorities to collect fees sufficient to cover inspection costs and sufficient to cover administrative costs. But that money went directly to agriculture. Treasury was sort of taken out of the game after 2002. But after 2002, the statute says that all the money in that account, quote, shall be credited to the Department of Agriculture account. So that sounds like there wasn't any other congressional appropriation here by virtue of this statute. After 2002, the money that was in the Treasury account was, quote, credited to the agriculture. That's right. That's my understanding of how- There's nothing in that account anymore. I mean, it may be there, but it's- Yes, there should be nothing in that account anymore. Now, just parenthetically, nothing turns on it for this argument. They say that something like 30% of their current inspection costs are funded by appropriations. That's their response to our separate cross-subsidization argument, which I think is inconsistent with the way Congress intended the statute to work. But for purposes of- Are there still appropriations? Excuse me, Your Honor? Are there still appropriations? Is there an act of Congress of some sort that appropriates funds for them in addition to what's raised by the fees? So it's not clear to me from the rule or even from their brief what funds other than the funds that they're raising through fees are being used to fund these exempt classes. My guess is that it is a general appropriation to, I think it's DHS, but I don't know if there's a specific earmark for this program. I just don't know. That's one of the things that they don't explain in the rule as to the cross-subsidization argument. One of the questions that I had, so I guess I'll ask them. Yeah, I think that's a question for them. You're coming to one of the things that bothered me. Go ahead. Right, so just to follow up on the account in Treasury, I also had sort of first understood this as putting it, like the Treasury account is sort of training wheels. They're transitioning from appropriations based to a fee paid. But the FACT Act is enacted in 1990, and it's not until 1996 that this Treasury account is set up. And at that time, it's set up for this temporary six-year period. And I'm just trying to understand, because one way to view this disputed provision, 136AA1C, which is the provision that allows, through fiscal year 2002, the maintenance of a reasonable balance in the Treasury account, is that it has something to do with the unusualness of maintaining a balance in a Treasury account as opposed to an agency's own independent ledger back at home. And so I just was wondering why it went from in-house at agriculture to this Treasury, what I refer to as a training wheels account, back to agriculture. Yeah, I don't know why they did that. I mean, I can tell you why they transitioned from Treasury to agriculture. I don't know sort of why the original change happened. The second change happened because I think the idea was that they were going to be financed through a user fee model. But I don't think it's right that their argument is that A1C, right, was an authorization to place money and to maintain a balance, right? An authorization to maintain a balance in this account. But that isn't so. The authorization to maintain money in this account is 5A, which says it establishes the account. And it says that the account shall contain all of the fees collected under this subsection. Right, but that's why I wonder about sort of a Treasury account versus an agriculture account, because ordinarily under appropriations law, my understanding is that you don't maintain balances year to year, that you have an appropriation for the default. I mean, obviously there's millions of exceptions, but the default is for the fiscal year. So if you have money somewhere and you don't use it, it reverts back to the general Treasury. So maintaining a balance, it seems to me, might be something that calls for statutory specification. And potentially maintaining a balance in this Treasury account might need more specification than just maintaining a balance in agriculture, you know, once it goes back home to agriculture. I'm just not sure about that, but I'm trying to understand the peculiarity of, you know, because the conditions in 1C are not only reasonable balance. It's maintaining and it's at Treasury. Well, I actually think it's not really any of those things because the A1 generally is about fee authorization, right? The beginning of the statute says the Secretary of Agriculture may prescribe and collect fees sufficient for three particular things. And the first and the second are sufficient to cover actual costs, right? And my view is that they are reading A and B to include the power that was granted, specifically granted in C. Well, maybe or maybe not. Go ahead, David. Well, so your point is that their interpretation makes C a surplus, right? But what do you think about the district court said it wasn't because he said it served an independent purpose, which he described as authorizing maintenance of a reasonable balance in a specific account of the Treasury Department for a limited period of time. Right, right. So the court did say that. And my answer to that is that the C is, mentions maintaining a reasonable balance, but the actual authorization that is granted in C is the authorization to prescribed and collect fees sufficient to maintain a reasonable balance, which is what they are doing now. In other words, A grants them authority sufficient to sufficient to cover the cost, right? That's a quote of inspection. B grants them the authority sufficient to cover the cost of administering, right? And what C does is give them authority to prescribe and collect fees more than sufficient to cover those two things. That is sufficient to carry a reserve. Maybe, go ahead, David. I'm sorry. I guess I had two questions. One is, it seems like one could say that authority to collect fees sufficient to cover services and authority to collect fees sufficient to cover administering would encompass authority to collect fees sufficient for, let's just call it cost smoothing, which is the reasonable balance for, you're not gonna hire and fire people just because in one period you need more of these services and another period less. So maybe one C is sort of surplusage altogether. And then the mystery is why only with respect to the treasury account. Now you said it doesn't make sense to have it be about the definition of the treasury account because five already includes, I guess it would be 5A talks about contain all the fees. But 5A says nothing about maintaining a balance. And that's the thing that it seems to me might be distinctive about one C. And again, if I knew more about appropriations law and the way the treasury account functions, the notion that Congress might wanna specify, look, you can maintain year to year a balance of these fees, even though the basic model is collect fees for the services you're doing in temporal, close temporal proximity to the service provided. But if there's a desire to have this holdover while that account exists, that seems like that could explain one C. Well, that would explain one C if one C said, and you can maintain a reasonable balance in this fund until the fund expires, but that's not what it says. It says that the agency can prescribe and collect fees sufficient to have this reserve, right? And I'm not sort of making this up. I mean, if you look at what the agency actually said before the authority expired, right? This was in a 1999 rulemaking. It's reproduced at 537 of the appendix. They say, we include a reserve building component in the amended fees to ensure that reserves can gradually be built to an adequate level by 2002, which the agency thought was essential to ensure continuity of service and the like. In other words, they understood their authority at the time was to build up a reserve that they can then use going forward. And by the way, we don't think they lack the authority to have a reserve balance, of course not. But the way the statutory scheme was supposed to work is they build up a reserve, right? And then if they're over on their estimate, as they were in 2011, for example, with respect to the passenger fee, they were $155 million over what it actually cost them according to the GAO. They can put that in the reserve, right? If they're under, they can draw from the reserve and they can use the reserve in the way they say that it's supposed to be used, which is, you know, for these sort of temporal fluctuations. But they can't, in your view, impose a fee to continue. Exactly. They can't impose a fee on top of a fee sufficient to cover inspection costs and administrative costs. But it's your view that they could build a fee into the costs sufficient to provide the services and administer the subsection. They could build a fee into that. No, so I think- Why not? Well, so if C didn't exist, right? The fight would be, we would be saying, sufficient to cover inspection costs means enough to cover, but not more than enough to cover, right? And they would be saying, well, it includes this authority to cover a reserve because that would be reasonable or whatever. And I would make that argument. And, you know, I think it would be a tough Chevron argument for me. But here, C exists and it was operative through 2002. And so until 2002, that means Congress said, you can prescribe and collect fees for three specific purposes. Two of them are to cover specific costs. And one of them is to exceed costs, right? And the fact that Congress then said that authority to collect fees, prescribe and collect fees sufficient to exceed costs and maintain a balance expires in 2002, means that it was expired in 2002, just as the agency thought it would before 2002, you know? Otherwise it doesn't, I don't think that the sunset provision is being given any effect at all. Well, it's sunsetting the account. I'm not sure I caught, I think you were very clear. I just think I was not absorbing entirely. You were saying you did or didn't think that, let's say there is no C and there is no treasury account. Right. You would be arguing that it was arbitrary and capricious to collect costs above the actual costs of the service your clients received in a particular period, and above the cost of administering in that particular period, to also build into the concepts of services and administering some cost smoothing buffer or reasonable balance. You would object to that as beyond what the statute- Well, you know, I might, I might object to it. What I'm saying is, I think I would probably have the better of that argument if there weren't Chevron. I think it would be a tough case for me if there were Chevron. But the problem with this case is, it's not just like- Right, no, I know that's not this. I'm just trying to understand, right? I'm just trying to understand the nature and limits of your, I do, I absolutely understand that your argument is that there's very strong and direct negative implication from 1C about this, because the prior statute before 1996 said you can collect services and for services for administering and to maintain a reasonable balance. Right. So you're saying, well, now they're separating it out and the only, the fate of reasonable balance dies with the treasury account. So I understand that that's your argument. And it's not even a negative implication. I just want to make clear that the, it's not like we're arguing sort of Congress precluded the agency from doing this full stop. We're arguing that Congress first expressly granted them the very authority that they are exercising now, but sunset it, right? But they just kept on doing it after the sunset provision, which seems to me to be an even stronger indication that they're no longer allowed to do it. Then if we were just talking about the sort of negative implication that you would normally think of, you know. I can turn this argument or this discussion just a little bit in order that we might or might not learn from others. Are there any other provisions with respect to other agencies that mirror this one? Or is this a purple cow? That's, you know, I'm not sure your honor. I'm not sure of any, any provisions that are, that are similar to this. Unfortunately, I apologize if I know I'm way over my time, but I did want to get to the way over. Well, you're just, you're into your rebuttal time. So, okay. Well, so very quickly, just on this issue of, of charging both passenger fees and commercial aircraft fees as to passenger aircraft. And we think that's precluded by the statute altogether. But at the, at the very least, if you disagree with that under Chevron, I think the, the rule itself is clearly arbitrary and capricious really for two reasons. One is that it just fails to explain despite numerous comments on this point, why it simply ignored the premise of the grand Thornton analysis, which is that passenger fees would cover inspection of the entire, of the entire aircraft. The agency responds that the underlying data shows that that's not in fact what grand Thornton did. Well, so the calculation it actually did was correct. That was just inherent language. So that is, that's what they say. And that's what they say in their brief. Well, if you look at the numbers, they're right. Well, I don't know if they're, well, a few points, Judge Tatel. First of all, they don't say that in the rule at all. We can look at the numbers and see that in fact, I mean, don't you agree that in fact, the numerator includes all, the denominator includes both commercial and carbon flights. So, you know, I don't, that's what they say, but the thing is that the actual premise of the analysis was that- Isn't that what the numbers show? That's what they say the numbers show. I mean, I don't personally- Well, can you look at the numbers and tell me they don't show that? The number is 819,000 flights. And they say that that is the total number of flight, the total number of cargo flights. I mean, maybe that's right, but even if it's right, I don't understand how that solves their problem because that just means that the analysis that they adopted, I mean, they explicitly adopted this Grant Thornton report is internally inconsistent. I mean, just before that 819, I'm looking at 510 of the appendix, right? There is a fee schedule that uses that 18, sorry, 819,000 number. Right next to that number, it says commercial air cargo only, right? And so commenters rightly wanted to figure out what does commercial air cargo only mean, okay? And the agency responds in the final rule. The term commercial air cargo only refers to those commercial aircraft carrying only cargo. This is a 245 of the JA. So even the agency in the final rule itself, when commenters are saying, hey, what is this number? They say it's cargo only. So look, I mean, I don't see how it solves their problem to tell you that the math doesn't match the actual explanation of the math. That seems like just describing a new problem. And then the other issue here is their explanation for why passenger aircraft are treated differently than cruise ships. They didn't explain it in the rule again. In the proposed rule at 20 of the JA, they say explicitly that they should be treated the same. They say consistent with our AQI fee authority, the cost of inspecting cruise ships themselves would be covered by the proposed sea passenger fee rather than a separate fee similar to the commercial maritime cargo vessel fee, just as the international air passenger fee covers the costs associated with inspecting the aircraft on which they arrived. Now there were, sorry. I thought that, I mean, in the language of the statute, it talks about related. And one of the things that the service relies on is, you know, to mean what you say it means and to mean what it means for the cargo, for the cruises, it would just say passenger fees include the cost of inspections of the aircraft as opposed to include the cost of related inspections of the aircraft. And their view and the rule does delineate different kinds of aircraft inspection costs. And, you know, what they say is certainly non-arbitrary that there is passenger cabin inspection, that there's waste that comes from service of passengers, that there's passenger luggage, you know, hold inspections and that those are inspections of the aircraft that are related to the passenger function. I mean, I'm telling you something you know, and that there's other inspection, the exterior of the aircraft and the cargo hold of a passenger aircraft that are not charged as part of the fee, but are charged separately as a generic aircraft fee. And so if that's actually what they are doing in terms of it's really three categories, there's passengers themselves and where they've been picking up mad cow disease and what they're carrying in their purse, that's, you know, fruit. And then there's the aircraft relating to passengers. And then there's the aircraft not relating to passengers. If those are three separate buckets, and if they're not charging twice for any of those three buckets, but just describing them as three rather than two, what is wrong with that? So a few points. First of all, just starting with the end that they're not charging twice. I don't know that they're not charging twice. They didn't give us the underlying data and they say that error was harmless, but I mean, it's not- Do we not have it now? We have it now. It was in the administrative record, but so I'm looking at, for example, page 3083 of the administrative record. It has a line item called program passenger aircraft, right? And then a separate line that I don't think was disclosed anywhere in the record called CBP-08 passenger aircraft inspection. Now that label sounds like it includes the inspection of the aircraft, but they say it's ambiguous, but it doesn't. But I don't know that that's true. I have no idea what that includes. They should have provided it with the proposed rule. So that's just on the double counting point. Then you asked, I think, there were several questions embedded in your question. One was about statutory authority and one is about what they were actually doing. So on what they were actually doing, they say that the difference between a cruise ship and a passenger plane is that cruise ships don't carry cargo. Okay, maybe that's a difference. A lot of passenger planes don't carry cargo too and they're still charging the commercial aircraft fee as to those planes. Also, they say that the inspection of the outside of the airplane is not related to passenger inspections. Okay, well then why is the inspection of the outside of a cruise ship related to passenger inspections? They never explained that at all and it makes no sense, right? I don't understand how those two things could be consistent with each other. It seems to me to warrant an explanation at the very least. They're doing categories of things. And if the equipment and the staff that they have that are able to do the inspection of the outside of aircraft are the same for aircraft that carry passengers and that don't, they don't have two separate enterprises for that. Whereas the whole of the enterprise that looks at cruise ships is about what passengers, it's this passenger specific service. So they're just allocating a cost of a service and aircraft happened to be both cargo and passenger. Well, two points. First of all, not all aircraft, most aircraft, most passenger aircraft don't carry cargo. But the category of passenger aircraft includes a category of hybrid. But Your Honor, your very cogent explanation of the difference just now included facts. Like there are different people doing these things and stuff like that. None of that is in the rule. If that's true, let them explain it. It's not even in their brief, right? But certainly it's not in the rule. And you can't come up, the post hoc rationalization rule, everybody understands. But that's sort of a basic thing about how the world works and how institutional functions operate now. That the outside of the plane is inspected by different people in the cargo line? That the same activity would be done by the same people. Anyway, I don't want to get into it. You know, maybe it's just that, but what about the argument about related? Right, so that's- That's the statutory argument. That's the statutory argument. And so our point there is that the reason the word related there is because the sentence is really kind of non-grammatical without the word. The sentence would read, the cost of the services with respect to passengers as a class includes the cost of inspections of the aircraft or other vehicle. Now you could figure out from context that it means, you know, the aircraft on which the person arrived, the passenger arrived, but it would just be a weird sentence. And the word related, I think, is there to show, you know, to tell you that the aircraft or other vehicle that they're talking about is the one on which the passenger arrived. But our point is that the second sentence doesn't do anything at all. If what it means is just that, you know, the cost as the passenger as a class is inspecting of the passenger and, you know, things related to the passenger, that would be true under the first sentence. We think what the second sentence is there to tell you is that when you're talking about passenger fees as a class, the costs associated with that class include the cost of the vehicle on which they arrived. But if you disagree with us on that under Chevron, I think they still have a pretty bad arbitrary and capricious problem. I don't understand. I'm sorry, I don't understand why you say the second sentence wouldn't mean anything. The first sentence says, the first sentence says, they must be commensurate with the person's plane, the fees. And the second one says that for passengers, that includes the related costs of the airplane. I don't understand the conflict there. I don't think there's any conflict. It's just, if you didn't have the second sentence, I think that it would be clear that the cost- And the agency has included in the calculation of the passenger fee, the related inspections of the aircraft. And I think that would be true under just the first sentence. And we think the second sentence is there. You know, that's our argument. My point is, if you disagree with that, if you defer to them, they still have the problem of failing to explain why their analysis contradicts the premises of their accountant and the cruise ship issue. Thank you, your honors. I'll give you a minute or two for rebuttal, okay? Thank you, I appreciate it. Thank you, your honors. May it please the court, life of revolved with the Department of Justice. I'd like to start on the reserve issue and maybe just start- Yes, please. A bit of a history of this, what is sort of an unusual, you know, now true user fee system, but that was not sort of the history in the 90s. And a lot of the fight is sort of about, you know, how the program operated both before 1996 and then from 1996 to 2002. So when USDA was granted this fee collection authority in the first place, at that time, it still, it had the authority to collect fees for the cost of providing services, but it still was dependent on Congress to appropriate, essentially to enact an appropriation that it allowed it to apply to the fund to get reimbursement for its expenses. So it was a fee authority, but still generally operating as if Congress was appropriating each year. You're talking about 1990 to 96 now? That's 1990 to 96. And then the 1996 statute, I mean, that system, Congress determined was not especially workable since the agency was still dependent on this cumbersome appropriations process. It's not certain that it would get the amount it would request in a particular year. It didn't truly have access to the fees collected to fund its program services. Now, let me interrupt you just a moment. I hate to do so. No, I don't really hate to do. Is there still an appropriations bill for this agency? Or is it a pure fee for services funding? It is still not a pure fee for service system. USDAFIS still receives some services, some appropriations and CBP, which does do a lot of the on the ground inspection work after Homeland Security Act also received appropriations. So they do then, there still is an appropriation bill. There still are appropriated funds. Yes. And that is the basis for the things like pedestrians entering the country, How does that distinguish what that's expended for from the general administrative costs that are accounted for in the fee for services? How do they know which bucket that's coming out of, if you would? Which bucket, the general program expense. They account for it. And this is sort of the thrust of the methodology they use in the latest rule by calculating a particular cost associated with the proportion of the program's expenses that are tied to the classes that are paying a fee and ensuring that the amount of the fee charged is derived by that proportion divided by the number. Now, as to the appropriated funds, I don't purport to have expertise in appropriations law, but the general nuisance that we put up with when I was trying to get appropriations, you had the two steps there, that you had the appropriation, you still had to go to the authorizers so that it was two steps before you ever actually got your hands on the money. Is that the case with appropriated funds here? Or how does that work if you know? I am not, I don't know for sure. I believe it is sort of the general two-step appropriation process. Thank you. But so- Go ahead. I'd love to hear your sort of big picture. And I'm also curious about whether during the, you're probably getting to that, the period from 1996 to 2002, were they also in that hybrid model where they're getting some appropriations? It just wasn't clear to me under 5B, which talks about appropriations acts, whether that's just the authority to use the fee revenue or whether that's also getting money from the treasury separate from the fee. But anyway, go ahead and explain to us the shift to- I think I understand. I will try and answer your question in the context of this explanation. So in 1996, Congress decides it does want to shift this to a true user fee program. But for us, the six-year transitional period, the way it operates is you do have this account in the treasury. I believe paragraph five says if you have more than a hundred million in that account, that excess amount is available without further appropriation. If you're under that, you are still waiting for Congress to issue an appropriation that essentially allows the agency to seek reimbursement for its expenses. And then Congress also provided that at the end of this transition period, any unobligated balance in the treasury accounts will be transferred to the USDA accounts and then be available for program expenses there. Any idea why the hundred million? The treasury account is now non-existent or exists and is emptied, correct? That's right. It was wound up at the end of this transition period. And the point of- Why a hundred million? What is that? I'm not sure what the particular sort of restriction imposed what the purpose for that. I mean, it does assure Congress that the agency has collected enough money that, you know, there's not a concern essentially of funding that's coming, not from the fee collection authority, but from Congress's general appropriations. Congress is getting the savings of setting this up as a user fee system, rather than, you know, something that is funded entirely by appropriations, as was the case before 1991. Could you just go straight to, so could you just give us your best argument as to why the authority granted in C to maintain a reasonable balance, which ends in O2, can continue today? That's the issue, right? That's what this issue is all about. Yes. And our point is just that 1C was conveying a particular authority specific to this treasury account under this sort of unusual transition period to maintain a reasonable balance in that account, even though it is somewhat unusual that you're maintaining a balance in a treasury account that's not being directly used for expenses of the program administrative costs, you know, making particularly clear that there's nothing wrong with the agency maintaining that balance for this period that will then become, be transferred to the agency at the end of that period. Let's see, A, what bothers me about that is that A says, A says they can impose a fee to cover the cost of providing services, the cost of providing services. It doesn't, how can you get a reasonable, an additional amount in there for a cushion? Well, I mean, the reason, I don't understand the other side to take issue with our general understanding what A does, which is the agency has long recognized you're recovering costs, but you're recovering costs in a situation in which one, you have this three-month temporal lag between performing the service and getting the fee for it. You also have a situation in which we know repeatedly there's going to be differences in the projection activity value from what we actually see. And, you know, when, as in the current COVID pandemic, we are getting much, many fewer fee generating activity than expected. You still have fixed costs that if you don't have a reserve, you're just not going to be able to recover the costs of the program in that regard. So, I mean, the authority to cover the costs includes under the particular features of this program, the reserve when that's how you actually recover costs and administer the program. What about Mr. Matilski's point that there was an understanding during this sort of what I call the training wheels period from 1996 to 2002, that a reserve would be built up and that once that's built up, you basically get ahead of the time lag. I mean, the time lag is just a time lag. And so the revenues do come in. And if there's a reserve there, maybe that's also enough to be the cushion for the ups and downs in terms of the usage of the service. So why don't we just understand Congress to have made that determination? Because it is curious that these three authorities to pay for services, to pay for administering, and to pay for maintaining a reasonable balance were in the FACT Act as originally enacted in 1990. And were converted into these three categories in 1996. And then the Category C vanishes. And it's just hard to know what to make of that under your theory, why it doesn't, why the narrative that Mr. Matilski has given us isn't the better understanding. Our argument as to what C is just that there's less need to be particularly clear on the authority to maintain a balance when you no longer have the unusual situation of a treasury account subject to these restrictions that will be transferred eventually. And there's no indication in the rulemaking in any of the legislative history or anything like that, that Congress thought the point was you get to some particular number. Congress hasn't said anything about what that number is. But then in 2002, you're just fixed at that number. The agency can do nothing to ensure that it's maintaining the sort of three-month, 90-day reserve it needs given the temporal features of the program. It just stuck at whatever that number ended up for whatever reason in 2002. But we do know that Congress must have expected that at the end of 2002, there would be a reasonable balance in that fund that would now transfer to the Agriculture Department, right? Yeah, yes. So why isn't Judge Tillard's sort of sense of this exactly right? That that's the cushion you get for the future. You know, if the program turns out to be a problem in terms of the ebb and flow of expenses and money and the cushion's not enough, the agency can go back to Congress and ask them to either fix it or to appropriate money or to allow it to re-institute the reasonable balance required. Well, that's just not what the agency was doing at any point during this period. As early as 1991, 1992, one of the reasons offered for the reserve is not just we need to build up the three months in light of the delay between when we perform the services when we get the fees. It's also this concern that you need some sort of reserve for continuity of operations. This is an area in which activity volumes might drop and we still have fixed costs. So if we don't have a reserve to sort of smooth those costs out, we're just not recovering costs. Also part of it, there was a reserve component of the rule in 1999, again in 2002, in 2004, 2006. Again, the agency is still using the fees collected to maintain a reserve and reporting the reserve balance to Congress the whole time. But I mean, there's no, the story that Congress expected there to be some number and then that was it going forward is not reflected anywhere. Earl, you said a few minutes ago that there was less need to be particularly clear for Congress to be particularly clear during the period when the authority had reverted to the Department of Agriculture. Then there was when the account was in the treasury. And does that have to do with, I'd like to hear sort of more why that is. Does that have to do with treasury account, typically fiscal year or treasury account, typically everything needs to be re-appropriated every year or authorized? Or what is the difference between the nature of the treasury account and the nature of things going forward under the auspices of the Department of Agriculture that supports your point that there's less need to be particularly clear after 2006? So the differences are first that now when USDA has collected these fees, they're immediately available and available until expended in the USDA accounts for these accounts. Whereas during the transition period, it's still subject to these restrictions that you can use them if you have over 100 million in the account, otherwise you're still waiting for an appropriation. And then two, we know that this, the account in which you're maintaining a balance will be wound up in 2000 at the end of fiscal year 2002. At that time, any unobligated balance will be transferred. Even in that situation, ultimately, the balance may be used for program purposes, but there's a number of steps at that time that we don't have here. And that's sort of what would make Congress potentially want to be particularly clear. And again, in offering... Does it really make sense to say Congress did this just to get rid of clarity? Is that what you're saying? You're saying they took it out because they didn't need to be as clear as they were in the past. So therefore, we don't want to be clear? Just that there are reasons to think you would want to be particularly clear that you have the authority to maintain a reasonable balance. I can see why there was a good reason to put it in. I'm not sure why there was a good reason to sunset or to leave it out of the further statute. Well, except it did sunset at the same time that the very accounts for which this need for clarity sunset as well. I mean, that both the 1C is specifically tied to this particular treasury account, which ends in fiscal year 2002. And that same language is in 1C. Would it have been possible for the agency over time here to simply label those things which draw on that reserve account as a general administration and put this in two buckets instead of three? Just not had a separate bucket for maintaining the balance. It may, I mean, that the... That would be sort of described as a different cost. Yeah. Whether it's described as a different cost versus the way the agency has consistently explained it as this is how we pay for the costs we have incurred. I'm not sure that makes a particular difference. The rationale that's been offered is that given the features of the program that the agency has sort of since 1991, 1992 explained, we need this reserve to cover the costs, both of providing services and administering the program. I want to ask you about a different issue, the cost subsidization issue. The airlines quote this sentence in the regulatory impact analysis, which says that AQI services served by classes that do not pay user fees are covered through appropriated funding or a portion of user fees otherwise collected. And you respond in your brief that I guess that that quote has to do with a proposal that was rejected. But in their reply brief, they say that's not the case. Can you clarify that for us? Yes, Your Honor. The context there, I mean, is it has particularly to do with both changes in the fee schedule that were adopted and certain ones that were rejected. Specifically what's being discussed there is this fee schedule adds fees charged to the cruise ship passengers and to users of all types that are receiving treatments, which is, as I understand it, essentially when you are trying to bring a shipment or something else that is determined to have some sort of pest infestation and you need to receive the treatment to ensure that that issue is remediated. Those are the two particular categories in which the regulatory impact assessment, I believe the rule discusses these ways too. Prior to those fees being charged, those costs may have been funded by other users. I believe there was a cruise ship vessel fee before the cruise ship passenger was being charged. And similarly, if you're not charging a specific fee for treatment, some of those costs may be borne by the general class of user. That's the particular sort of context in which that statement is offered. And it's not at all connected to the sort of exempt users that they're trying to connect it to now. There's nothing in the regulatory impact assessment about that. Okay. Mr. McClitsky, you are out of time, but you can take two minutes. Thank you, Your Honor. If I could just start very quickly on that last point. If you look at the paragraph I'm talking about, this is at 169 of the record. It's not true that it doesn't apply to these non-exempt categories. It says, AQI services received by classes that did not pay user fees are covered through appropriated funding or a portion of user fees otherwise collected. Then it says, classes that do not currently pay user fees will not pay user fees under the rule and would not under the alternatives evaluated, including private vehicles, pedestrian, bus passengers, et cetera. Those are the non-exempt groups. The treatment point is two paragraphs later and has nothing at all to do with this. There's just this unexplained admission of cross-subsidization in the rule. We think that is an independent basis to vacate the rule or that portion of the rule. Now, getting back to the first issue, I just want to make two points clear. One is that, again, I just want to emphasize that when my friend is describing section A1, he's talking about A1C, he's talking about it as an authorization to maintain a reasonable balance. And that is not what it is. It's an authorization to prescribe and collect fees. That's the whole point, right? And then two, we do not dispute- Tell me what flows from that. What flows from it is that there were until 2002, the authority to collect fees for three different reasons. One, to cover costs, one to cover administrative costs and one to maintain a reserve. And they got rid of one of those. So that means you're only left with the first two. They say we still have the third one, right? Now, the agency- I mean, that's the sum and substance of our argument. The second point is just that we don't object to the proposition that they should be able to have a reserve. Congress thought so too, which is why it thought they should build up a reserve through 2002. That's what they themselves thought. Again, this is at 537 of the record in a 1999 rulemaking. But their argument now is that- their argument assumes that their predictions are going to be systematically under actual cost, right? But there's no reason to think that's true. They can maintain a reserve. They start with the balance that they created. And then when they're over, when their projections are too high, it's not like they give my clients a refund. They keep the money and they can put that money into the reserve. Now, the third thing they said is catastrophic events like 9-11 or COVID. That's true. But throughout the government, when there are catastrophic events that aren't accounted for by a statutory scheme, every agency has to go back to Congress. And this agency is no different. It's perfectly reasonable to think that Congress legislated for the mine run case, not for catastrophic events that haven't happened, you know, ever or in a century. And in terms of the mine run case, our way of reading the statutory scheme, it seems to me, makes perfect sense. And theirs can't account for C. Okay. Thank you very much. Case is submitted.
judges: Tatel, Pillard, Sentelle